# EXHIBIT

# A

# DEPARTMENT OF HOMELAND SECURITY

# Office of Inspector General



# SEMIANNUAL REPORT TO THE CONGRESS

## October 1, 2004 – March 31, 2005

## Working Relationship Principles For Agencies and Offices of Inspector General

The Inspector General (IG) Act establishes for most agencies an Office of Inspector General (OIG) and sets out its mission, responsibilities, and authority. The IG is under the general supervision of the agency head. The unique nature of the IG function can present a number of challenges for establishing and maintaining effective working relationships. The following working relationship principles provide some guidance for agencies and OIGs.

To work most effectively together, the Agency and its OIG need to clearly define what the two consider to be a productive relationship and then consciously manage toward that goal in an atmosphere of mutual respect.

By providing objective information to promote government management, decision-making, and accountability, the OIG contributes to the Agency's success. The OIG is an agent of positive change, focusing on eliminating waste, fraud, and abuse, and on identifying problems and recommendations for corrective actions by agency leadership. The OIG provides the agency and Congress with objective assessments of opportunities to be more successful. The OIG, although not under the direct supervision of senior agency management, must keep them and the Congress fully and currently informed of significant OIG activities. Given the complexity of management and policy issues, OIG and the Agency may sometimes disagree on the extent of a problem and the need for and scope of corrective action. However, such disagreements should not cause the relationship between the OIG and the Agency to become unproductive.

### To work together most effectively, the OIG and the Agency should strive to:

*Foster open communications at all levels.* The Agency will promptly respond to the OIG requests for information to facilitate OIG activities and acknowledge challenges that the OIG can help address. Surprises are to be avoided. With very limited exceptions primarily related to investigations, the OIG should keep the Agency advised of its work and its findings on a timely basis, and strive to provide information helpful to the Agency at the earliest possible stage.

*Interact with professionalism and mutual respect.* Each party should always act in good faith and presume the same from the other. Both parties share as a common goal the successful accomplishment of the Agency's mission.

*Recognize and respect the mission and priorities of the Agency and the OIG.* The Agency should recognize the OIG's independent role in carrying out its mission within the Agency, while recognizing the responsibility of the OIG to report both to the Congress and to the Agency Head. The OIG should work to carry out its functions with a minimum of disruption to the primary work of the Agency.

*Be thorough, objective, and fair.* The OIG must perform its work thoroughly, objectively, and with consideration to the Agency's point of view. When responding, the Agency will objectively consider differing opinions and means of improving operations. Both sides will recognize successes in addressing management challenges.

*Be engaged.* The OIG and Agency management will work cooperatively in identifying the most important areas for OIG work, as well as the best means of addressing the results of that work, while maintaining the OIG's statutory independence of operation. In addition, agencies need to recognize that the OIG also will need to carry out work that is self-initiated, congressionally requested, or mandated by law.

*Be knowledgeable.* The OIG will continually strive to keep abreast of agency programs and operations, and Agency management will be kept informed of OIG activities and concerns being raised in the course of OIG work. Agencies will help ensure that the OIG is kept up to date on current matters and events.

*Provide feedback.* The Agency and the OIG should implement mechanisms, both formal and informal, to ensure prompt and regular feedback.



*Office of Inspector General*

**U.S. Department of Homeland Security**
Washington, DC 20528

Homeland
Security

May 1, 2005

The Honorable Michael Chertoff
Secretary
U.S. Department of Homeland Security
Washington, D.C. 20528

Dear Mr. Secretary:

I am pleased to provide you our *Semiannual Report to the Congress* for the six-month period ending March 31, 2005. The Inspector General Act of 1978 (Public Law 95-452), as amended, requires the preparation of a Semiannual Report to Congress highlighting the activities of our office. The Act also mandates that you transmit this report to the appropriate committees of Congress within 30 days of receipt, together with any comments that you wish to make.

During the past two years, the Department has made notable progress in securing the homeland and integrating its programs and operations. However, as you have repeatedly pointed out, further work is needed. Your *Second Stage Review* initiative is an important first step in identifying what work is yet to be done to improve the Department's ability to secure our homeland. As you embark on the daunting task of taking the Department to the "next level," we believe the Office of Inspector General has a vital role to play in ensuring the success of the Department and assisting you to reach that "next level." By coordinating closely with Department management, we have attempted to align our program of audits, inspections, and investigations with the mission and priorities of the Department. Our three principal goals are to add value to the Department's programs and operations; ensure the integrity of those programs and operations; and provide quality, timely products and services to you, your leadership team, and Congress. Accordingly, we believe that the working relationship principles outlined by the federal Inspector General community and the Office of Management and Budget, which are enumerated on the inside front cover of this report, will continue to serve the Department and our office well as we carry out our respective responsibilities to reach the "next level."

We are grateful for the interest and support that you have provided to our office to date. We look forward to working closely with you, your leadership team, and the Congress toward the goal of promoting economy, efficiency, and effectiveness in DHS programs and operations, as well as helping the Department accomplish its critical mission in the very challenging months ahead.

Sincerely,

Richard L. Skinner

Richard L. Skinner
Acting Inspector General

# TABLE OF CONTENTS

STATISTICAL HIGHLIGHTS OF OIG ACTIVITIES.................................................. 1

EXECUTIVE SUMMARY............................................................................................. 2

DEPARTMENT OF HOMELAND SECURITY PROFILE................................ 4

OFFICE OF INSPECTOR GENERAL PROFILE.......................................... 5

SUMMARY OF SIGNIFICANT OIG ACTIVITY............................................ 6

Border and Transportation Security............................................................ 6
Information Analysis and Infrastructure Protection............................ 18
Emergency Preparedness and Response................................................ 18
Management................................................................................................ 20
United States Coast Guard...................................................................... 23
United States Secret Service.................................................................. 25
United States Citizenship and Immigration Services........................ 26
Office of State and Local Government Coordination and Preparedness.............. 27

OTHER OIG ACTIVITIES.................................................................. 28

LEGISLATIVE AND REGULATORY REVIEW............................. 29

CONGRESSIONAL BRIEFINGS AND TESTIMONY..................... 31

APPENDICES........................................................................ 32

Appendix 1........ Audit Reports with Questioned Costs.......................... 33
Appendix 1b...... Audit Reports with Funds Put to Better Use.............. 35
Appendix 2........ Compliance - Resolution of Reports and Recommendations............... 36
Appendix 3........ Management Reports Issued.......................................... 37
Appendix 4........ Financial Assistance Audit Reports Issued................. 39
Appendix 5........ Schedule of Amounts Due and Recovered................... 45
Appendix 6........ Acronyms.................................................................... 47
Appendix 7........ OIG Headquarters and Field Office Contacts and Locations.............. 49
Appendix 8........ Index to Reporting Requirements.............................. 53

Semiannual Report to the Congress

October 1, 2004 – March 31, 2005

## STATISTICAL HIGHLIGHTS OF OIG ACTIVITIES

## October 1, 2004 – March 31, 2005

**Dollar Impact (in thousands)**

| | |
|---|---|
| Questioned Costs | $27,641,002 |
| Funds Put to Better Use | $0 |

Management Agreement That Funds Be:

| | |
|---|---|
| Recovered | $0 |
| De-obligated | $169,550 |

| | |
|---|---|
| Funds Recovered (Investigative Recoveries) | $49,159 |
| Funds Recovered (Audit Recoveries) | $10,879,543 |

| | |
|---|---|
| Fines and Restitutions | $812,214 |
| Administrative Cost Savings and Recoveries | $94,585,517 |

### Activities

| | |
|---|---|
| OIG Reports Issued (Audits and Inspections) | 48 |
| OIG Reports Issued (Investigations) | 252 |
| Contract Audit Reports Processed | 0 |
| Single Audit Reports Processed | 25 |
| Defense Contract Audit Agency | 0 |
| Investigations Initiated | 1,412 |
| Investigations Closed | 360 |
| Open Investigations | 1,997 |
| Investigations Referred for Prosecution | 101 |
| Investigations Accepted for Prosecution | 49 |
| Investigations Declined for Prosecution | 42 |

| | |
|---|---|
| Arrests | 146 |
| Indictments | 65 |
| Convictions | 43 |
| Personnel Actions | 24 |

| | |
|---|---|
| Total Complaints Received | 7,515 |
| Total Hotlines Received | 4,608 |
| Complaints Referred (to programs or other agencies) | 4,383 |
| Complaints Closed | 6,878 |

Office of Inspector General

Department of Homeland Security

# EXECUTIVE SUMMARY

This is the fifth Semiannual Report to the Congress issued by the Department of Homeland Security's (DHS) Office of Inspector General (OIG) since its establishment in January 2003. It is issued pursuant to the provisions of Section 5 of the Inspector General Act of 1978, as amended, and covers the period from October 1, 2004, to March 31, 2005, unless otherwise noted. The report is organized to reflect our organization and that of the Department.

During this reporting period, we completed significant audit, inspection, and investigative work to promote the economy, efficiency, effectiveness, and integrity of DHS programs and operations. Specifically, we issued 18 audit, inspections, and information technology reports (Appendix 3). We also issued 252 investigative reports. Additionally, we issued 30 financial assistance audit reports, and processed 25 single grant audits (Appendix 4) issued by other organizations according to the Office of Management and Budget (OMB) Circular A-133.

We supported departmental efforts to improve the efficiency and effectiveness of departmental programs, to secure the homeland, and, to make the American people safer by producing the following particularly noteworthy reports: *DHS Needs to Strengthen Controls For Remote Access to Its Systems and Data* (OIG-05-03) issued November 2004; *Independent Auditor's Report on DHS' FY 2004 Financial Statements* (OIG-05-05) issued December 2004; *Major Management Challenges Facing the Department of Homeland Security* (OIG-05-06) issued December 2004; *A Review of the Use of Stolen Passports from Visa Waiver Countries to Enter the United States* (OIG-05-07) issued December 2004; *Implementation of the United States Visitor and Immigrant Status Indicator Technology Program at Land Border Ports of Entry* (OIG-05-11) issued February 2005; *Follow-Up Audit of Passenger and Baggage Screening Procedures at Domestic Airports* (OIG-05-16) issued March 2005; *A Review of Procedures to Prevent Passenger Baggage Thefts* (OIG-05-17) issued March 2005; and, *Irregularities in the Development of the Transportation Security Operations Center* (OIG-05-18) issued March 2005. Our reports provide the Secretary and the Congress with an objective assessment of the issues, while also providing specific recommendations to correct deficiencies, improve the efficiency, effectiveness, and economy of the respective program, and make the American people safer.

During this reporting period, our audits, inspections, and investigations resulted in questioned costs of $27,641,002, of which $18,536,119 was determined to be unsupported costs. Additionally, recoveries, restitutions, and fines totaled $106,326,433. Our investigations resulted in 146 arrests, 65 indictments, and 43 convictions. In addition,

Semiannual Report to the Congress

October 1, 2004 – March 31, 2005

investigators closed 360 investigations and 6,878 complaints received through the hotline.

We have a dual reporting responsibility, to the Congress as well as to the Secretary. During the reporting period, we continued our active engagement with Congress through numerous meetings, briefings, and dialogues with members and staff of the Department's authorizing and appropriations committees and subcommittees on a range of issues relating to our work and that of the DHS. The Acting Inspector General (IG) testified before Congress on January 26, 2005, before Chairman Susan Collins and the Senate Committee on Homeland Security and Governmental Affairs at a hearing entitled, "The Department of Homeland Security: The Road Ahead." The purpose of the testimony was to help the Committee identify the key challenges facing the Department over the next several years. Witnesses discussed the findings of recent reports on the achievements and remaining challenges in accomplishing DHS' mission. The Acting IG's testimony included examples from our past work and challenges highlighted in our recent report entitled, "Major Management Challenges Facing the Department of Homeland Security." The Acting IG's statement for the record, and work cited in the testimony can be read on our website at www.dhs.gov. Additional information on this hearing is included in the "Congressional Briefings and Testimony" section of this report.

# DEPARTMENT OF HOMELAND SECURITY PROFILE

On November 25, 2002, President Bush signed the Homeland Security Act (Public Law 107-296, as amended), officially creating DHS with the primary mission of protecting the American homeland. On January 24, 2003, DHS became operational. Formulation of the new Department took a major step forward on March 1, 2003, when, according to the President's reorganization plan, 22 agencies and approximately 180,000 employees were transferred to the new Department.

The Department's first priority is to protect the nation against further terrorist attacks. Component agencies analyze threats and intelligence, guard the U.S. borders and airports, protect America's critical infrastructure, and coordinate the U.S. response to national emergencies.

The Department has been organized into the following five directorates:

Border and Transportation Security
Science and Technology
Information Analysis and Infrastructure Protection
Emergency Preparedness and Response
Management

Other critical components of DHS include the:

United States Coast Guard
United States Secret Service
United States Citizenship and Immigration Service
Office of State and Local Government Coordination and Preparedness

*Semiannual Report to the Congress*

October 1, 2004 – March 31, 2005

## OFFICE OF INSPECTOR GENERAL PROFILE

The *Homeland Security Act of 2002* provided for the establishment of an OIG in DHS by amendment to the *Inspector General Act of 1978* (5 USC App. 3, as amended). By this action, Congress and the administration ensured independent and objective audits, inspections, and investigations of the operations of the Department.

The IG is appointed by the President, subject to confirmation by the Senate, and reports directly to the Secretary of DHS and to the Congress. The Inspector General Act ensures the IG's independence. This independence enhances our ability to prevent and detect fraud, waste, and abuse, as well as to provide objective and credible reports to the Secretary and Congress regarding the economy, efficiency, and effectiveness of DHS' programs and operations.

We are authorized to have 502 full-time employees; we are comprised of five functional components; and, we are based in the District of Columbia. Currently, we have 26 field offices throughout the country.

## Department of Homeland Security
## Office of Inspector General
## Management Team



Office of Inspector General

Department of Homeland Security

# SUMMARY OF SIGNIFICANT OIG ACTIVITY

## BORDER AND TRANSPORTATION SECURITY (BTS)

### Transportation Security Administration (TSA)

#### TSA's Role in the Use and Dissemination of Airline Passenger Data

During September 2003, TSA's assistance in providing airline passenger data to a Department of Defense subcontractor sparked criticism that the agency had acted inappropriately. We responded by conducting a review of TSA's role in the use and dissemination of airline passenger data in fourteen data transfers occurring between February 2002 and June 2003. Collectively, these transfers involved more than 12 million passenger records for individuals traveling on at least six air carriers: America West Airlines, American Airlines, Continental Airlines, Delta Air Lines, Frontier Airlines, and JetBlue Airways. Although appropriate steps were not always taken to protect passenger information from inappropriate disclosure, there was evidence of only one instance where records, related to a passenger, were publicly disclosed. Beyond that issue, TSA officials made certain misleading or erroneous statements about these transfers that undercut the agency's public credibility. However, these misstatements were premised on an incomplete understanding of the underlying facts rather than any intent to mischaracterize known information. We identified several policy and procedural adjustments TSA should adopt to strengthen privacy practices and guard against future inappropriate disclosure of records and misstatements. (OIG-05-12, March 2005, ISP)

#### Irregularities in the Development of the Transportation Security Operations Center

In May 2004, TSA's Office of Internal Affairs and Program Review reported to us the results of its review of suspicious purchases made during the development and building of the Transportation Security Operations Center. In our follow-up inspection of the acquisition and procurement activities involved in the development of the center, we confirmed the internal affair's determination that multiple violations of procurement policy and regulations had occurred. Inappropriate activities included the unauthorized expenditures of $500,000 for decorative artwork and plants; the deliberate splitting of purchases to exceed purchase card spending limits; the acquisition of extravagant kitchen appliances and excessive fitness center equipment; and, the construction of offices that exceed TSA office size standards. We concluded that inadequate management controls left the project vulnerable to waste and abuse. The breakdown in the system was attributable largely to a self-imposed 90-day deadline to complete the project as well as to the senior managers, who believed that full compliance with federal regulations and TSA rules governing procurements would impede meeting the deadline. Senior management's failure to enforce procurement regulations and policy, created an environment that

October 1, 2004 – March 31, 2005

fostered improper or questionable purchases and construction decisions, as well as a disregard for the ethical duty of impartiality. (OIG-05-18, March 2005, ISP)

## Procedures to Prevent Passenger Baggage Thefts

TSA baggage screeners examine more than 250 million pieces of commercial air passengers' checked and carry-on baggage annually at the nation's commercial airports. Since TSA baggage screeners began inspecting baggage, passengers have filed more than 14,000 complaints concerning theft, lost, or damaged baggage. In light of criticisms expressed by passengers about theft of personal items from their baggage, we evaluated TSA's procedures to prevent passenger baggage thefts and how it processes baggage theft and loss claims. We could not ascertain an authoritative estimate of the extent of passenger baggage contents theft. However, the Air Travelers Association, an air passenger advocacy group, noted that baggage contents thefts have increased now that TSA baggage screeners open baggage routinely during the screening process. The theft issue calls into question whether screeners' supervision is adequate; whether the physical layout of inspection stations contributes to the pilferage; and, whether it is feasible for TSA to install electronic surveillance techniques near inspection stations to deter thefts.

Between January 1, 2003, and September 30, 2004, TSA fired 37 baggage screeners for stealing. Although it is now TSA policy to complete a favorably adjudicated criminal history records check before offering employment to job candidates, 36 of the fired screeners began employment before their background checks were completed. Also, TSA passenger and baggage screeners do not receive any specific ethics training before they begin employment or formal ethics training while on the job. With regard to claims processing, even when it is possible to verify that a passenger suffered a theft or loss, it may be impossible to attribute responsibility between TSA baggage screeners and airline baggage handlers. In addition to resuming negotiations with the airline industry to settle shared loss liability issues, TSA should install electronic surveillance techniques near inspection stations to deter and detect baggage thefts and require all baggage screeners to participate in professional ethics training. (OIG-05-17, March 2005, ISP)

## Follow-up Audit of Passenger and Baggage Screening Procedures At Domestic Airports

We recently completed a review of screener performance at selected airports around the country. We began our review at the end of November 2004, and completed our fieldwork in early February 2005. Our review was a follow-up to similar work that we had performed at the same airports in 2003. It was initiated in response to a request from the Chairman of the House Aviation Subcommittee, Transportation and Infrastructure Committee.

Improvements are still needed in the screening process to ensure that dangerous prohibited items are not being carried into the sterile areas of airports, or do not enter the checked baggage system. In our report on the results of our first round of testing (OIG-04-037), which we issued in September 2004, we made several recommendations for improvements in the areas of training, equipment, policies and procedures, and management practices. For the most part, TSA agreed with our recommendations and is taking action to implement them. However, despite the fact that the majority of screeners with whom our testers came in contact were diligent in the performance of their duties and conscious of the responsibility those duties carry, the lack of improvement since our last audit indicates that significant improvement in performance may not be possible without greater use of new technology.

We recommended in our previous report that the TSA administrator aggressively pursue the development and deployment of innovations and improvements to aviation security technologies, particularly for checkpoint screening. TSA is currently testing several such technologies, including backscatter x-ray, explosive trace detection portals, and document scanners. We encourage TSA to expedite its testing programs and give priority to technologies, such as backscatter x-ray, that will enable the screening workforce to better detect both weapons and explosives. (OIG-05-16, March 2005, OA)

### Two Seattle-Tacoma International Airport Security Screeners Charged with Converting Property of Another and Possession of Schedule II Narcotics

On November 14, 2004, we conducted an undercover operation targeting Seattle-Tacoma International Airport TSA security screeners, who allegedly had been stealing prescription medications from wheelchair bound passengers. One TSA screener was arrested for stealing OxyContin pills from an undercover agent's carry-on bag. The screener confessed and admitted to stealing other passengers' prescription medications on approximately twenty or more occasions since June 2004. A second TSA screener and co-conspirator also confessed to stealing prescription medications from passengers' carry-on bags on five separate occasions and was subsequently arrested. On December 10, 2004, the United States Attorney's Office, Western District of Washington, charged both TSA security screeners with an officer or employee of United States converting property of another, and possession of schedule II narcotics without a prescription. On February 4, 2005, both TSA security screeners resigned in lieu of termination. This investigation is pending further judicial action. (OI)

### Sacramento International Airport Security Screener Charged with Theft and Possession of a Controlled Substance

We initiated an investigation into the allegation that a TSA security screener at the Sacramento International Airport was stealing from passenger baggage. On February 25, 2005, we introduced "target" baggage and the screener removed the planted money from one of the bags. The Sacramento County Sheriff's Department arrested the

Semiannual Report to the Congress

October 1, 2004 – March 31, 2005

screener. When arrested, the screener had in his possession a prescription medication that he admitted taking from a separate passenger's bag. He also admitted stealing money and prescription medication from other passengers' luggage during the previous four to six weeks. A consent search of the screener's residence located additional prescription medication stolen from passenger baggage. The screener was charged with theft and possession of a controlled substance and, on March 7, 2005, pleaded not guilty at his initial appearance in Sacramento County Court. (OI)

## U.S. Immigration and Customs Enforcement (ICE)

### Alleged Actions by TSA to Discipline Federal Air Marshals for Talking to the Press, Congress, or the Public

On July 30, 2003, two articles discussing Federal Air Marshal Service (FAMS) issues appeared on the MSNBC website, an online news service. The FAMS Director sent a memoranda to all FAMS employees on July 30 and August 1, 2003, concerning the disclosure of sensitive information. In August 2003, a third MSNBC article reported that the TSA was now conducting a "witch hunt" to ferret out and discipline employees in the FAMS program who had spoken to the media. This article further alleged that air marshals were told that TSA planned to use the USA PATRIOT Act authority to determine who talked to the media. FAMS and TSA conducted nine investigations of air marshals for allegedly making unauthorized disclosures to the press or public. These investigations, and actions taken by FAMS and TSA against air marshals, as a result of these investigations, were appropriate. No air marshal was investigated, or retaliated against, for talking to the press, Congress, or the public; and TSA, or FAMS did not threaten to nor take action against the air marshals under authority of the USA PATRIOT Act. However, air marshals from two locations said that they were threatened with arrest and prosecution if they were found to have released sensitive security information. (OIG-05-01, November 2004, OA)

### ICE Reporting of FY 2004 Drug Control Funds

Under 21 U.S.C. 1704(d) and the Office of National Drug Control Policy (ONDCP) Circular *Drug Control Accounting*, dated April 18, 2003, we were required to review assertions, made by management, related to the FY 2004 obligations for the National Drug Control Program. The assertions related to the methodology used to calculate the obligations, application of methodology, reprogramming or transfers, and compliance with fund control notices issued by ONDCP.

The FY 2004 DHS financial statement audit report identified serious accounting problems at ICE, including ICE falling seriously behind in the performance of basic accounting functions such as account reconciliations, analysis of materially abnormal balances, and proper budgetary accounting. These problems prevented ICE from submitting timely and accurate financial reports to DHS during FY 2004. The FY 2004

Page 9

DHS financial statement audit report also identified a material weakness related to financial systems functionality and technology at DHS, of which ICE is a part. Because of these matters, the auditors were unable to provide an opinion or other type of assurance with respect to the ONDCP criteria related to the reliability of obligation data. Otherwise, nothing came to the auditors' attention that caused them to believe that management's assertions were not fairly stated in all material respects, based on the ONDCP's criteria. (OIG-05-15, March 2005, OA)

### Correctional Officer Indicted for Civil Rights Violation (Update)

On February 14, 2005, as a result of our investigation, a Louisiana Parish correctional officer was sentenced for violating the rights of a Mexican national who was being detained. The correctional officer was found guilty on two counts of Violation of Civil Rights Under the Color of Law for physically assaulting the alien. The officer was sentenced to 30-months confinement; three years supervised release; and, ordered to pay restitution and assessments. (OI)

### ICE Contract Employee Pleaded Guilty to Sexually Abusing Two Detainees

We initiated an investigation based upon an allegation received from ICE's Detention and Removal Operations (DRO) in San Pedro, California, that an ICE contract employee correctional officer sexually abused a male transgender detainee. The correctional officer admitted to his participation with the detainee to his supervisor, and voluntarily terminated his employment as a result of his behavior. The correctional officer subsequently admitted sexually abusing a second transgender detainee. This investigation was presented to the Civil Rights Division, Criminal Section, of the U.S. Attorney's Office, Los Angeles, California. On July 9, 2004, the correctional officer signed a plea agreement admitting to one count of "sexual abuse of a ward." On August 9, 2004, the correctional officer pleaded guilty to the one count. He was sentenced on October 25, 2004, to 36 months probation and required to file as a sexual offender. (OI)

### Former Detention Officer Sentenced for Child Pornography

A former DHS detention officer was sentenced in the Northern District of Texas Federal Court to 63 months imprisonment as a result of our investigation. The officer pleaded guilty in October 2004 to one count of possession of child pornography in interstate commerce and to a criminal forfeiture allegation. The officer admitted using the internet to download images of child pornography onto his home computer. As a result of a search warrant executed by our office and ICE agents, the former detention officer was found to be in possession of approximately 345 images of child pornography, which included visual depictions of minors under the age of 12 engaged in sexually explicit conduct, visual sadistic images, and depictions of violence. (OI)

Semiannual Report to the Congress

October 1, 2004 – March 31, 2005

## Scam Man Posing As "Immigration and Naturalization Services (INS)" Official Arrested With Counterfeit Immigration Stamps

We conducted an investigation in which two confidential informants identified a man in Newark, NJ, allegedly displaying "INS Inspector" identification, accepting cash payments to place Alien Identification Telecommunications System (ADIT) stamps in passports. Surveillance and undercover transactions with the subject resulted in his arrest after accepting $8,000 to place an ADIT stamp in a passport. Recovered from the subject's vehicle at the time of his arrest was a counterfeit ADIT stamp, stamp-making materials, a stamp pad, and counterfeit documents in a fictitious name identifying the subject as an "INS Inspector." The subject was not and never had been an employee of the U.S. Department of Homeland Security. The subject was convicted in the judicial district of New Jersey for fraud and misuse of visas, permits, and other documents; sentenced to one year in custody; and ordered to pay $35,000 in restitution. (OI)

## Immigration Enforcement Officer Arrested for Gambling and Conspiracy

We initiated an investigation into allegations that an immigration officer in the Anchorage DRO office, provided information about an ongoing FBI investigation to the subjects of the investigation. Subsequent investigation revealed that the officer was involved in the underlying offense, illegal gambling. On December 16, 2004, the officer was arrested by OIG and the FBI and charged with illegal gambling and conspiracy. Additional judicial action is pending. (OI)

## ICE Detainee Found Dead in Cell

We initiated an investigation into the suspicious death of an ICE detainee at the Hampton Roads Regional Jail in Portsmouth, Virginia. The detainee was found inside his cell, face down on his bunk with a knotted sheet around his neck. An inmate at the Hampton jail alleged that other inmates assaulted the detainee, which resulted in the detainee's death.

The OIG investigation determined through interviews with inmates, jail employees, police investigators, and the state's medical examiner's office, that the detainee's injuries, and the circumstances surrounding the death of the detainee, appeared to be consistent with a suicide and not the result of an assault. (OI)

## Management Implication Report Issued to Prevent Illegal Aliens Escape

We initiated an investigation to review the circumstances surrounding the escape of three undocumented alien prisoners from the custody of the ICE DRO while being transported on a DRO bus. Our investigation determined that certain modifications made to buses, used by the DRO to transport undocumented alien prisoners, have facilitated prisoner escapes and created a safety concern for the officers manning the buses.

We made several recommendations to ICE:

Page 11

- Disseminate an officer's safety notice to all law enforcement authorities regarding these particular buses.
- Direct officers to take specific security precautions until specific retrofits have been accomplished.
- Re-evaluate the current design standards and carry out necessary modifications. (OI)

### FAM Indicted for Obstructing Investigation of Alien Smuggling Ring

We conducted an investigation that resulted in the arrest and indictment of a FAM assigned to the New York Field Office for Conspiracy Against Rights. The FAM is accused of trying to protect accused Korean human traffickers in New York City by conspiring to place one of the victims on a return flight to South Korea, after the victim had agreed to cooperate with federal agents. The victims had been imported for a $10,000 fee, then forced to work off their debt as hostesses and prostitutes in a Queens, New York, bar owned and operated by the traffickers. (OI)

### Two FPS Officers and FPS Criminal Investigator Arrested

We initiated a joint investigation with the FBI regarding two FPS police officers in San Francisco, CA, attempting to stop a motorist for a moving violation. The motorist failed to yield and a high-speed pursuit commenced. The pursuit ended with the subject's vehicle being blocked. When the vehicle tried to escape, one FPS officer fired four rounds at the front wheel of the subject's vehicle. Both FPS officers told an FPS investigator that the vehicle attempted to run down the first officer. The motorist was arrested, charged, and held for assault on a federal officer. Several days later, the second officer admitted to the FPS investigator that his initial statement was false. The FPS investigator failed to include the second FPS officer's admission in his report in an effort to protect both officers. Our investigation resulted in both officers being arrested on October 28, 2004, for providing a false statement, deprivation of civil rights, and deprivation of rights under color of law. On November 15, 2004, both officers resigned, pleaded guilty, and await sentencing. On November 23, 2004, the FPS investigator was charged with creation of a false record in a federal investigation and, on December 7, 2004, was arrested. The trial is scheduled for May 2005. (OI)

## Customs and Border Protection (CBP)

### Implementation of the United States Visitor and Immigrant Status Indicator Technology Program at Land Border Ports of Entry

We reviewed the planning and deployment efforts undertaken by the United States Visitor and Immigrant Status Indicator Technology (US-VISIT) program office to expand the program to land borders. Defining and achieving the long term, comprehensive vision

Semiannual Report to the Congress

October 1, 2004 – March 31, 2005

for an automated, integrated entry exit program will require a massive coordinated effort and will not be realized for another five to ten years. We did not make recommendations in this report because the US-VISIT program is evolving rapidly. However, we highlighted several areas that could inhibit the program's overall effectiveness if not addressed.

Initial results suggest that the deployment of US-VISIT at land ports of entry (POE) has not slowed the flow of traffic through the POEs, but this result may be attributed to the fact that few travelers are processed. The US-VISIT program implemented on December 31, 2004, initially enrolled just a fraction, approximately 3%, of the foreign visitors entering the United States at land POEs.

The specifications for the automated exit component at land POEs remain undefined and, therefore, an exit component for travelers required to enroll in US-VISIT is not yet available. Finally, the time-consuming process that CBP officers must use to query multiple database systems to verify travelers' identities and identify potential criminals and terrorists is particularly problematic at land POEs because of the limited time available to conduct the queries. As a result, travelers at land POEs are not inspected as intensively as those at air and sea POEs. Integration of the multiple database systems is needed to enable CBP officers at land POEs to validate the identity of visitors requesting admission. (OIG-05-11, February 2005, ISP)

**Use of Stolen Passports from Visa Waiver Countries to Enter the United States**
We examined the actions taken by CBP inspectors when aliens seek admission to the United States using stolen passports. Aliens applying for admission using stolen passports had little reason to fear apprehension and usually were admitted. It made only a small difference whether the stolen passports were posted in the lookout system.

We reviewed two groups that attempted to use stolen passports to enter the United States. One group did not have lookouts posted for their stolen passports prior to their attempted entries: 79 out of 98 were admitted. The second group used passports that had been posted in the lookout system prior to their attempt: 57 out of 78 were admitted. Also, from the second group, even though 39 of the 78 were referred to secondary inspections for more intensive interviews, 18 were subsequently admitted. We could not determine the inspectors' rationale for admitting the aliens with lookouts; the records of the secondary inspections often were nonexistent or too sketchy to be useful. Further, there were circumstantial associations between aliens that used certain stolen Visa Waiver Program passports and Al Qaeda.

We determined that when CBP received new reports of stolen passports, it did not routinely review existing admission records to determine if any of the stolen passports have already been used. In addition, there were no procedures to pass information

Page 13

concerning the use of stolen passports to enter the United States from CBP to ICE for subsequent investigations.

While the 136 successful entries using stolen passports is a relatively small number, those entries are significant for many reasons. First, the passports were obtained by criminal acts. Second, though small, the number could and should be zero, at least for those admissions that occurred after lookouts were posted. Actionable information was reported and logged into the lookout systems, and yet entry was accomplished, defeating a costly apparatus established precisely to prevent such an occurrence. Third, there was no law enforcement pursuit once recognition occurred that an illegal entry had been accomplished.

We recommended that CBP develop procedures that (1) require inspectors to refer aliens to secondary inspections when the aliens' passports are the subjects of lookouts; (2) require that inspectors record, in detail, the results of the secondary inspections and justifications for subsequent admissions; (3) require that a supervisor review and approve an inspector's decision to admit an alien who was the subject of a lookout, and that the review be recorded as part of the secondary inspections record; (4) initiate routine reviews of admission records to identify prior uses of stolen passports; and, (5) report information on the successful use of stolen passports to enter the United States to ICE for investigation.

In addition, we recommended that ICE: (1) investigate, locate, and remove from the United States persons who have used stolen passports to gain entry to the country and report the outcomes of its investigations to CBP; and, (2) investigate the activities of those aliens who used certain stolen passports issued by the Visa Waiver Program. (OIG-05-07, December 2004, ISP)

**CBP's Reporting of FY 2004 Drug Control Funds**
Under 21 United States Code (USC) 1704(d) and the ONDCP Circular *Drug Control Accounting*, dated April 18, 2003, we were required to review assertions, made by management, related to FY 2004 obligations for the National Drug Control Program. The assertions related to the methodology used to calculate the obligations, application of methodology, reprogramming or transfers, and compliance with fund control notices issued by ONDCP.

The FY 2004 DHS financial statement audit noted a material weakness that related to financial systems functionality and technology at DHS, of which CBP is a part. Except for the effects of this material weakness, if any, nothing came to the auditors' attention that caused them to believe that management's assertions were not fairly stated in all material respects, based on the ONDCP's criteria. (OIG-05-14, March 2005, OA)

October 1, 2004 – March 31, 2005

## CBP Agents Exonerated

We received an allegation from an undocumented alien that he was beaten and then run over by CBP agents, leaving him hospitalized in critical condition. Our investigation determined that, after the vehicle the alien had been driving was stopped by a Border Patrol officer, the alien fled on foot and was struck by a hit and run vehicle when he ran across a busy intersection. Witnesses confirmed that CBP agents had detained another individual who had been in the car and did not pursue the alien. Our investigation confirmed that the vehicle that struck the alien was not a Border Patrol vehicle. The alien's medical records showed that he sustained injuries as a result of being struck by a vehicle and his blood alcohol level was approximately three times the legal limit. Our investigation concluded that the allegation, against the Border Patrol agents, was unfounded. (OI)

## INS Information Officer Pleaded Guilty to Alien Smuggling and Bribery

We conducted a joint investigation with Department of Justice (DOJ) OIG and the FBI regarding the conduct of a legacy INS information officer. As a result of our investigation, the INS officer was indicted by a Federal Grand Jury in the Eastern District of Michigan and pleaded guilty to charges of alien smuggling and bribery. Our investigation determined that from April 1999 to October 2001, the INS officer provided entry stamps in exchange for bribes to as many as 60 foreign nationals, the majority of whom were carrying fraudulent Yemeni passports. This stamp, together with a valid foreign passport, allows the bearer to enter the United States as a returning Lawful Permanent Resident. In addition, the INS officer created approximately 90 fraudulent Advance Parole Documents (I-512), which were sold to illegal aliens who used them to enter the United States. A co-conspirator, Salah Al-Solihi, a Yemini national, was also charged and convicted of alien smuggling in connection with our investigation. (OI)

## CBP Officer Indicted for Accepting Bribes

We conducted a joint investigation with the FBI regarding allegations that a CBP officer, assigned to O'Hare International Airport, was attempting to extort thousands of dollars from a Czechoslovakian national. Our investigation revealed evidence that the officer was involved in numerous immigration related schemes, including accepting bribes for providing information obtained from a law enforcement communication system; accepting a bribe in order to cause the deportation of an alien who had filed a federal sexual harassment lawsuit against her employer; accepting a bribe for using his official position to influence the emigration of a two-year-old child; and, accepting bribes to issue temporary legal status to aliens who were in the United States illegally. On November 3, 2004, the officer and six other individuals were charged in a 19-count Federal Grand Jury indictment for violations including conspiracy, extortion, obstruction of justice, computer fraud, and multiple counts of bribery and identification fraud. The officer is currently on unpaid leave pending trial. (OI)

## CBP Inspector Convicted of Importation of an Alien for Immoral Purpose

A joint investigation with the FBI resulted in a CBP Inspector in El Paso, Texas, pleading guilty to a charge of allowing the illegal entry of an alien, into the United States, in exchange for sex. The indictment led to the guilty plea after the inspector was arrested during an undercover sting operation. On November 23, 2004, the inspector was sentenced to 21 months in prison, ordered to serve 2 years supervised release and perform 200 hours community service. (OI)

## CBP Inspector Convicted of Conspiracy to Import Cocaine and Bribery

We conducted a joint investigation with the FBI and CBP which determined that on June 11, 2004, a CBP inspector located in El Paso, TX, allowed vehicles loaded with cocaine to enter the U.S. from Mexico, without inspection, in exchange for a bribery payment of $6,000. On March 14, 2005, as a result of our investigation, the CBP inspector was sentenced to 100 months in prison after pleading guilty to conspiracy to import over 5 kilograms of cocaine and bribery. Additionally, the inspector received three years supervised release and was ordered to pay $7,000 restitution. (OI)

## CBP Supervisor and CBP Agent Arrested for Public Corruption

Our investigation was predicated upon a DOJ OIG audit of travel voucher claims submitted by Border Patrol Agents who were temporarily assigned to Operation Safeguard, a border control initiative that increased the presence of uniformed agents along the international border in remote areas of Arizona. The DOJ OIG audit and our investigation revealed that fraudulent claims for reimbursement had been submitted by an agent and his supervisor. On November 5, 2004, the agent and his supervisor were arrested. On January 6, 2005, they were arraigned in the U.S. District Court in Arizona. Trial is pending. (OI)

## CBP Agent and Illegal Alien Arrested for Public Corruption and Narcotics Smuggling

The OIG, FBI, and CBP jointly conducted an investigation that resulted in the arrest of a CBP agent and an illegal alien for possession of marijuana, a controlled substance, with intent to distribute. The agent picked up ten green duffel bags and the illegal alien along the U.S. Mexican Border. The bags were placed into the DHS CBP vehicle. After their arrest, it was determined that the duffel bags contained what appeared to be marijuana, approximately 749.7 pounds, with a street value of $599,760. On February 2, 2005, a federal grand jury in California indicted the agent and the illegal alien on possession and distribution charges, and aiding and abetting. Judicial action is proceeding. (OI)

October 1, 2004 – March 31, 2005

 

### CBP Officer Pleaded Guilty to Importation of Marijuana with Intent to Distribute

On September 13, 2004, our investigation determined that a CBP officer attempted to smuggle approximately 535 pounds of marijuana from Canada into the United States through the Lynden, Washington POE. The marijuana, which is commonly known as "B.C. Bud," had an approximate street value of 1.2 million dollars. On September 23, 2004, the CBP officer was indicted in the Western District of Washington for knowingly and intentionally possessing approximately 535 pounds of marijuana, with intent to distribute, and importation of marijuana, with the intent to distribute. On November 17, 2004, the officer pleaded guilty to the importation of marijuana with the intent to distribute. On February 4, 2005, the officer was sentenced to serve five years, followed by five years of supervised release. (OI)

### CBP Agent Investigated for Assault

We initiated an investigation of a CBP agent who allegedly assaulted an undocumented Mexican national by striking him with his service weapon at the time of his apprehension. On January 5, 2005, the documentation and evidence secured during our investigation was forwarded to the DOJ, Civil Rights Division, Criminal Section, Washington, D.C., for prosecutorial opinion. On January 26, 2005, criminal prosecution was declined and the matter was referred to CBP for administrative review. (OI)

### CBP Canine Enforcement Officer Arrested on Child Molestation Charges

We conducted a joint investigation with ICE OPR and the FBI Corruption Task Force into the allegation that a CBP canine enforcement officer was passing narcotic loaded vehicles through the Nogales, Arizona POE. As a result of our investigation, search warrants were executed on the officer's residence and storage unit where we discovered and seized in excess of 30,000 images of child pornography, including videos. The Santa Cruz County Sheriff's Department used this evidence to indict the officer in the State of Arizona on 384 counts of child molestation. Additionally, the officer's wife and a customer have been arrested on narcotics charges and have pleaded guilty. The investigation continues. (OI)

## CBP Agent Indicted for Harboring of Illegal Aliens

We conducted an investigation into an allegation that a border patrol agent assigned to the Naco Arizona Station was harboring an illegal alien. We executed a federal search warrant on the agent's apartment. As a result of our investigation, on March 9, 2005, a federal grand jury, in the District of Arizona, indicted the agent for the Harboring of Illegal Aliens. Our investigation has shown that the agent paid to have alien smugglers, known as "coyotes," smuggle an illegal alien into the United States. Judicial action is proceeding. (OI)

## *INFORMATION ANALYSIS AND INFRASTRUCTURE PROTECTION (IAIP)*

### IAIP Advisor Suspected of Failing to Disclose Terrorist Ties is Exonerated

We initiated an investigation, regarding an advisor to the Under Secretary, IAIP, who was briefly removed from his position after the FBI discovered he failed to disclose prior work with an organization headed by an individual indicted on terrorism-related money laundering charges. Our investigation determined that the employee was placed on administrative leave after the DHS, Office of Security (OS) received information that the employee had failed to disclose an association with an individual suspected of ties to terrorism. The OS conducted an internal investigation of the allegations, and reinstated the employee. Our investigation concluded that the OS investigation was conducted thoroughly and according to OS policies and procedures. Additionally, our investigation developed no evidence that the employee intentionally omitted any information regarding past associations from his security questionnaire. (OI)

## *EMERGENCY PREPAREDNESS AND RESPONSE (EP&R)*

We issued 30 financial assistance audit reports, including 24 audits of disaster assistance sub-grants valued at about $160 million. We also audited Rhode Island, New Jersey, Louisiana, and Wisconsin's administration of their grant relief programs and concluded that certain financial and management controls were needed. We questioned a total of $10,151,839 costs, of which $1,481,516 were unsupported.

We processed 25 single grant audits issued by other organizations according to OMB Circular A-133. The single grant audit reports questioned $17,489,163, of which $17,054,603 were unsupported.

An itemized list of these audit reports is included in Appendix 4.

October 1, 2004 – March 31, 2005

## Louisiana's Administration of the Hazard Mitigation Grant (HMGP) and Unmet Needs (UN) Programs

We audited the administration of the HMGP and UN funding by the State of Louisiana's Office of Homeland Security and Emergency Preparedness (LHLS/EP). The audit objective was to determine if LHLS/EP administered Federal Emergency Management Agency (FEMA) HMGP and UN according to federal regulations and properly accounted for and used FEMA program funds. This report focuses on LHLS/EP's policies and procedures for assuring that grant funds were managed, controlled, and expended in accordance with applicable laws and regulations, including the Stafford Act and Title 44 of the *Code of Federal Regulations* (CFR).

We initiated this audit based on the preliminary findings of an investigation being conducted by the OIG OI. The scope of the audit included hazard mitigation and UN funding totaling $39,296,943 in direct project costs and $1,227,969 in administrative and management costs from eight disasters.

We determined that LHLS/EP did not administer the FEMA HMGP and UN programs according to federal regulations and did not properly account for and use FEMA program funds. As a result, we questioned $617,787 of ineligible management and administrative costs and identified other conditions that increased the likelihood that fraud, waste, and abuse occurred without detection. For example, LHLS/EP did not obtain FEMA approval for scope of work changes, as required. LHLS/EP's inadequate administration was largely due to the lack of procedures for administering grant funds and staff having minimal program knowledge and experience. As a result of our audit, and a review of documentation submitted by LHLS/EP, FEMA has requested the State of Louisiana to pay over $30 million in federal funds spent under three FEMA mitigation programs, unless the State can submit additional information establishing the legitimate use of project funds. (DD-02-05, November, 2004, OA)

### Fourteen Local Residents Arrested for Submitting Fraudulent Claims

We conducted a joint investigation with the U.S. Postal Inspection Service, which resulted in the arrest of 14 Miami-Dade County residents who were paid a total of more than $156,000 in disaster assistance for providing fraudulent information in their applications to FEMA. These individuals were charged with multiple counts of wire fraud, mail fraud, and submitting false and fraudulent claims. Judicial action is pending. Investigation continues. (OI)

### Cerro Grande Fire Assistance Act Claims Denied (Update)

On May 4, 2000, the National Park Service initiated a prescribed burn, known as the Cerro Grande Prescribed Fire, which exceeded containment capabilities. A Presidential disaster was declared for the area in and around Los Alamos, New Mexico. Congress enacted the Cerro Grande Fire Assistance Act (CGFAA) to fully compensate victims

whose claims were not covered by the Presidential declared disaster. FEMA was designated to administer the CGFAA. An applicant under the CGFAA submitted a claim for lost wages, punitive damages, personal property damage, evacuation expenses, and medical expenses. The claimant received $42,934.02 in initial payments for evacuation and medical expenses. The claimant later submitted a final claim of $94,585,516.77. Our investigation revealed that the basis for the claim, including medical expenses and the evacuation expenses, was fraudulent. FEMA administratively denied the claim and recouped the initial payment. The claimant appealed FEMA's administrative decision, which resulted in an arbitration panel deciding in the government's favor, denying the final claim of $94,585,516.77 and awarding the government the recoupment of the initial $42,934.02 payment. The investigation is pending judicial review by the United States Attorney's Office for New Mexico for a prosecutive decision. (OI)

### EP&R Official Resigns After Diverting Federal Money for Advanced Degree Tuition Costs

Our investigation determined that an official with the Mitigation Division at EP&R diverted $17,500 in government funds to pay for his graduate degree tuition at a local university. This official also submitted a second invoice for $12,500, but this invoice was stopped prior to the payment being disbursed. Our investigation determined that this official diverted the funds by instructing two subordinate employees to fraudulently sign the funding and approval documents associated with the payments. The United States Attorney's Office declined the investigation for criminal prosecution in favor of administrative action by EP&R, and full restitution by the official. The official resigned from DHS while under OIG investigation and made full restitution of $17,500 to EP&R. (OI)

## MANAGEMENT

### Independent Auditors' Report on DHS' FY 2004 Financial Statements

The independent auditors' report on DHS' financial statements was prepared by the independent public accounting firm, KPMG. KPMG was unable to provide an opinion as to whether the Department's FY 2004 statements were presented fairly in all material respects. This disclaimer of opinion was due specifically to circumstances at ICE, the inability to complete audit procedures over certain costs and budgetary transactions at the United States Coast Guard (USCG), the lack of reconciliations for intra-governmental balances, and the accelerated reporting deadline of November 15 that prevented an extension of audit procedures.

KPMG reported that ICE did not adequately maintain its accounting records during FY 2004 and was unable to provide support for certain transactions. ICE's financial reporting environment underwent significant changes in FY 2004. Its legacy agency, the

October 1, 2004 – March 31, 2005

Immigration and Naturalization Service, and the former U.S. Customs Service were reorganized into three new bureaus: ICE, CBP, and the United States Citizenship and Immigration Services (CIS). ICE experienced significant budget difficulties during the year due, at least in part, to the late preparation of agreements to reimburse it for costs incurred on others' behalf. In FY 2004, ICE became the accounting services provider for several other Department components, as well as supporting its own and CIS' accounting needs. ICE also experienced significant staff turnover. As a result, ICE fell seriously behind in basic accounting functions such as account reconciliations, analysis of material abnormal balances, and proper budgetary accounting.

KPMG was unable to complete audit procedures over certain costs and budgetary transactions at the USCG. The USCG contributed significantly to many of the material weaknesses identified in the auditors' report, and the accelerated reporting deadline left insufficient time for the auditors to overcome the difficulties these weaknesses presented.

The Department had significant out-of-balance conditions with other federal entities that were not reconciled; therefore, it could not support certain balances on its own books. The most significant out-of-balance conditions existed at ICE. A lack of resources in the Office of the Chief Financial Officer prevented the accountant, responsible for intra-governmental reconciliations, from researching and reconciling these differences in a timely manner during the year and at year-end.

The financial statement audit had to be completed three months earlier than the prior year due to the accelerated reporting deadline of November 15. The Department had little time to focus on correcting deficiencies from KPMG's prior report before being subjected to another financial statement audit.

KPMG reported 10 material weaknesses as a result of its audit: financial management structure; financial management and oversight at ICE; financial reporting; financial systems functionality and technology; fund balance with Treasury; property, plant and equipment; operating materials and supplies, and seized property; undelivered orders, accounts and grants payable, and disbursements; budgetary accounting; and intragovernmental and intradepartmental balances. In addition, the report cited the following three reportable conditions: deferred revenue on immigration and naturalization applications; environmental liabilities; and custodial activity performed by CBP. KPMG also identified instances of non-compliance with the Federal Managers' Financial Integrity Act of 1982, the Federal Information Security Management Act, Single Audit Act Amendments of 1996, and the Improper Payments Information Act of 2002. (OIG-05-05, December 2004, OA)

Page 21

## Summary of Evaluation of DHS' Security Program for Its Intelligence Systems

The *E-Government Act* (Public Law 107-347) passed by the 107th Congress and signed into law by the President on December 17, 2002, recognized the importance of information security to the economic and national security interests of the United States. Title III of the E-Government Act, entitled the *Federal Information Security Management Act* (FISMA), requires each federal agency to develop, document, and implement an agency-wide information security program. The agency's security program should provide security for the information and the information systems that support the operations and assets of the agency, including those provided or managed by another agency, contractor, or other source.

We performed an independent evaluation of DHS' security program for its intelligence systems as required by FISMA. The overall objective of this evaluation was to identify whether DHS' information security program and practices for its intelligence systems were adequate and effective in protecting the information from unauthorized access, use, disclosure, disruption, modification, or destruction. We reviewed five systems for compliance with FISMA and the Director of Central Intelligence Directive 6/3. We also performed vulnerability tests of security controls for these five systems. Furthermore, we evaluated DHS' Plan of Actions and Milestones process for its intelligence systems and assessed DHS' security training program.

This review was conducted between April 2004 and July 2004. It represents a baseline evaluation of DHS' intelligence program according to FISMA. (OIG-05-04, January 2005, IT)

## DHS Requires Additional Processes and Controls Over Its National Security Systems

We performed an audit of DHS' national security systems. The overall objective of the audit was to determine whether DHS and its organizational components have implemented adequate security to protect their national security systems. We performed our work at the program and organizational component levels. We reviewed national security systems policies and procedures, and conducted vulnerability assessments and security control reviews for a sample of national security systems at six DHS organizational components.

Our audit was conducted between April 2004 and August 2004. We recommended that DHS take certain steps to: (1) provide adequate security for the information and information systems that support its classified operations and assets; and, (2) ensure the confidentiality, integrity, and availability of vital classified information. DHS concurred with our recommendations. (OIG-05-09, January 2005, IT)

October 1, 2004 – March 31, 2005

## DHS Needs to Strengthen Controls For Remote Access to Its Systems and Data

DHS does not provide adequate or effective system security controls over remote access to its computer systems and data. While DHS has established policy governing remote access, and has developed procedures for granting, monitoring, and removing user access, these guidelines have not been fully implemented by the components because they are still developing processes or they are waiting to obtain automated tools to assist them in performing these functions. Further, DHS has not established configuration guidelines for the hosts providing remote access to its networks.

In addition, DHS components have not established effective system controls on remote access. Specifically: (1) remote access hosts do not provide strong protection against unauthorized access; (2) systems were not appropriately patched; and, (3) modems that may be unauthorized were detected on DHS networks. Due to these remote access exposures, there is an increased risk that unauthorized people could gain access to DHS networks and compromise the confidentiality, integrity, and availability of sensitive information systems and resources.

Our report includes three recommendations that will assist DHS in remedying the deficiencies identified. Specifically, the Chief Information Officer (CIO) should:

- Update the *DHS Sensitive Systems Handbook* (DHS Handbook) to include implementation procedures and configuration settings for remote access to DHS systems.
- Ensure that procedures for granting, monitoring, and removing user access are fully implemented.
- Ensure that all necessary system and application patches are applied in a timely manner.

The DHS CIO concurred with our recommendations and stated that many of them have been incorporated into DHS' planning and are now reflected in the Department's program objectives and milestones. In addition, subsequent to the completion of our audit work, officials from each of the components said that they had taken or planned corrective action to address many of the vulnerabilities identified in our review. (OIG-05-03, November 2004, IT)

## UNITED STATES COAST GUARD (USCG)

### USCG Reporting of FY2004 Drug Control Funds

Under 21 U.S.C. 1704(d) and the ONDCP Circular *Drug Control Accounting*, dated April 18, 2003, we were required to review assertions made by management relating to

FY 2004 obligations for the National Drug Control Program. The assertions related to the methodology used to calculate the obligations, application of the methodology, reprogrammings or transfers, and compliance with fund control notices issued by the ONDCP.

The auditors noted a material weakness identified during the FY 2004 DHS financial statement audit that related to financial systems functionality and technology at DHS, of which USCG is a part. The auditors also noted other specific conditions at USCG, identified by the financial statement auditors, that contributed to material weaknesses at DHS related to financial reporting, fund balance with Treasury, budgetary accounting, and undelivered orders. Except for the effects of these material weaknesses, if any, nothing came to the auditors' attention that caused them to believe that management's assertions were not fairly stated in all material respects, based on the ONDCP's criteria. (OIG-05-13, March 2005, OA)

### Compliance with the Currituck Beach Lighthouse Operating License

Outer Banks Conservationists, Inc. (OBC) operated the Currituck Beach Lighthouse under a 20-year license from the USCG, raising revenue for preservation, maintenance, and operation of this historical landmark. After 13 years, the USCG declared the property excess and the Department of the Interior awarded the property to OBC under the National Historic Lighthouse Preservation Act. The General Services Administration deeded the property to OBC, thereby terminating the license from the USCG and triggering payment by OBC of revenues raised in excess of expenses for preservation, maintenance, and operation of the lighthouse. At the request of the House Government Reform Committee and several interested members of Congress, we monitored the settlement of the license, including OBC's final accounting and the USCG's determination of the amount OBC owed the government.

Several federal agencies were involved, which complicated the settlement. Also, OBC had other operations on the lighthouse property, as well as on the surrounding property, which complicated the accounting. The USCG calculated the amount of excess revenue, owed the government, to settle the license was $328,392, and we concurred. The USCG also allowed OBC to use $220,000 for planned maintenance and restoration of the lighthouse, and demanded the balance of $108,392 from OBC. While OBC had no definitive legal authority to use the $220,000 for the restoration and maintenance contracts it had cancelled, we deemed the USCG's permission to be equitable, considering the circumstances in this matter. (OIG-05-08, December 2004, OA)

### USCG Employee Admits to Theft of Government Property

We received an allegation that a USCG exchange employee was stealing alcohol from the USCG exchange warehouse. A joint investigation conducted with the USCG Investigative Service determined that the exchange employee was indeed responsible for

October 1, 2004 – March 31, 2005

the thefts. Video surveillance was conducted of the exchange warehouse and at the time of his arrest, the subject had $1,900 worth of liquor in his personal vehicle. A federal grand jury indicted the subject on one count of Conversion of Federal Property and the subject was subsequently arrested. The employee entered a guilty plea prior to the trial, was sentenced to 5 years probation, and was ordered to pay restitution in the amount of $30,000. The employee was terminated. (OI)

### Allegations of Sexual Assault Not Corroborated

A former USCG Academy Cadet, who had withdrawn from the Academy, alleged that she had been the victim of sexual assault by a fellow cadet whom she confronted when a classmate confided to her that she was also sexually assaulted by the same cadet. The complainant provided a list of potential witnesses; however, after dozens of interviews, we were unable to produce any information or evidence to corroborate these allegations. The cadet accused of the sexual assault specifically denied the allegations, provided an exculpatory affidavit, and passed a polygraph examination regarding the substance of that affidavit. The classmate, whom the complainant claimed had confided in her that she also had been sexually assaulted, denied that she had ever been assaulted and claimed to have remained in a personal relationship with the cadet who reportedly assaulted her.

Our investigation confirmed allegations by the complainant that her room had been vandalized, and that she had been the subject of inappropriate remarks from fellow cadets during her out-processing period. USCG Academy officials responded appropriately when notified of these incidents. (OI)

## UNITED STATES SECRET SERVICE (USSS)

### USSS Agents Accept Corporate Funding to Finance Criminal Investigations Without Authorization

Two USSS special agents assigned to the Electronic Crimes Task Force accepted $40,000 in corporate funding in violation of USSS policy to finance undercover investigations into the manufacturing and distribution of pirated music CDs. USSS policy allows for the acceptance of such funding, but only with specific headquarters approval. The requisite executive approval was not received in this instance and the specific accounting protocol for the control of such funds proscribed by USSS policy was not followed. Our investigation produced no evidence that any of the corporate funds had been disbursed for any purpose other than in support of criminal investigation of pirated CDs. The efforts of the special agents resulted in multiple arrests and successful prosecutions in both the Southern and Eastern Districts of New York. The U.S. Attorney, Eastern District of New York, reviewed the facts of this investigation and determined there was no criminal conduct. The investigation has been referred to the USSS for administrative action. (OI)

## UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES (CIS)

### District Adjudications Officer Pleaded Guilty to Sexual Assault
We conducted an investigation that determined a CIS District Adjudications Officer sexually assaulted a female applicant during a citizenship interview. On March 4, 2005, the employee entered a guilty plea to a misdemeanor charge and was sentenced to weekend confinement for six months, five years supervised probation, and a $2,500 fine with a $10 special assessment. The employee was terminated by CIS. (OI)

### CIS Information Officer Admits to Selling Counterfeit Documents
We conducted a joint investigation with ICE OPR resulting in a CIS information officer in Laguna Niguel, CA, being indicted on September 22, 2004, by a federal grand jury in the Central District of California, and subsequently arrested on September 27, 2004, on four counts of fraud and misuse of visas, permits, and other documents. The officer was indicted for creating and selling counterfeit INS "Notices of Approval" for employment authorization to undocumented Philippine aliens. The activity was documented to have occurred over a period of at least two years. When confronted with the evidence and the recordings, the officer admitted to creating and selling counterfeit INS notices and labor certification documents as genuine documents to five known individuals. These documents were portrayed to authorize the buyer's employment and residence in the United States. He charged these individuals $6,000. On September 9, 2004, the officer submitted a four-page statement to CIS management, at Laguna Niguel, detailing his account of his activities relating to the incident, and his request for reinstatement to his position. Trial is scheduled for April 2005. (OI)

### Arrest of Individual Posing as INS Employee
On September 29, 2004, as the result of our investigation, an individual posing as an INS employee was arrested and subsequently indicted on October 15, 2004, for conspiracy; impersonation of a federal officer; false statements; and, eight counts of fraud and misuse of entry documents. The subject charged victims a fee of $5,000-6,000 each to assist in obtaining permanent residency documents. It is estimated that the subject received in excess of $200,000 from this scheme. The subject remains in custody without bail. Trial is scheduled for March 2005. (OI)

### CIS Information Officer Indicted for Bribery (Update)
A former CIS Information Officer was sentenced on October 29, 2004, in federal district court in Miami, Florida. The officer had previously pleaded guilty to bribery and immigration fraud and sentenced to six months incarceration and four months home confinement. It was also ordered that she forfeit $2,000, which was seized at her residence, as well as pay a fine in the amount of $5,900, the amount she was paid by a confidential informant. (OI)

October 1, 2004 – March 31, 2005

## CIS District Adjudications Officer Pleaded Guilty to Bribery (Update)

We conducted a joint investigation with the FBI regarding an allegation that a district adjudications officer in the CIS San Jose, CA, office was extorting money from immigration applicants. In April 2003, the officer told a Chinese National attempting to obtain U.S. citizenship that he would have difficulty but there would be no problems if the victim paid him $2,000. On May 6, 2003, the FBI and our office observed the officer taking a $1,000 bribe from the victim. On November 22, 2004, the officer was sentenced to two counts of Charging and Collecting Unauthorized Fees in Naturalization Proceedings; ordered to serve four years probation; complete 100 hours of community service; fined $200; and, ordered to pay $3,000 in restitution. The officer has been terminated. (OI)

## OFFICE OF STATE AND LOCAL GOVERNMENT COORDINATION AND PREPAREDNESS

### Port Security Grant Program

We reviewed the Department's Port Security Grant Program. The purpose of the program is to reduce the vulnerability of American ports to potential terrorist attacks by enhancing facility and operational security. The program has awarded approximately $560 million for over 1,200 projects.

We reported that the program's eligibility criteria are directed broadly at national critical seaports and the current design of the program compromises the program's ability to direct resources toward the nation's highest priorities. The program did not have the benefit of national key asset and critical infrastructure protection information now being developed by the IAIP directorate. In addition, grant award decisions were made with the intent of expending all available funding, and spreading funds to as many applicants as possible, leading the program to fund 258 low-scoring projects at a cost of $67 million.

Moreover, the program lacks DHS criteria for granting awards to the private sector. Private entities received substantial funding, some of which went to projects that reviewers scored below average or worse, during the evaluation process. Furthermore, after three rounds of grants, all grant recipients had expended only $106.9 million, or 21% of the total program awards as of September 30, 2004. Finally, there are conflicting goals for the program in the form of competing priorities among the Maritime Transportation Security Act of 2002, the competitive grant program mandated by Congress, and the risk-based direction of grant monies. The statutory intent and future direction of port security grants is unclear.

The report contained 12 recommendations and encouraged DHS to implement them
before proceeding with the program's fifth round of grants. The recommendations
focused on (1) establishing a clear goal for the program; (2) ensuring the program is
supporting national infrastructure protection priorities; (3) improving the evaluation,
selection, and award process; and, (4) improving administration of the program.
(OIG-05-10, January 2005, ISP)

## OTHER OIG ACTIVITIES

**Major Management Challenges Facing the Department of Homeland Security**
The OIG, based, in part, on assessments by Congress, the Department, the Government
Accountability Office, and others, has identified "major management challenges" facing
the Department, for inclusion in the Department's Performance and Accountability
Report issued on November 15, 2004. These challenges are a major factor in setting our
priorities for audits and inspections of DHS programs and operations. As required by the
Reports Consolidation Act of 2000, we update our assessment of management challenges
annually.

During its first 20 months of existence, the Department worked to accomplish the largest
reorganization of the federal government in more than half a century. This task, creating
the third largest Cabinet agency with the critical, core mission of protecting the country
against another terrorist attack, has presented many challenges to the Department's
managers and employees.

We identified the challenges in the areas listed below. (OIG-05-06, December 2004, OA)

- Consolidating the Department's components
- Contract Management
- Grants Management
- Financial Management
- Human Capital Management
- Integration of Information Systems
- Security of Information Technology Infrastructure
- Infrastructure Threat Assessment
- Border Security
- Transportation Security

**Oversight of Non-DHS OIG Audits**
We processed 25 single audit reports prepared by non-DHS OIG auditors on DHS
programs and activities. We continue to monitor the actions taken to implement the
recommendations in those reports. These reports were conducted according to OMB

Semiannual Report to the Congress

October 1, 2004 – March 31, 2005

Circular A-133, Audits of States, Local Governments, and Non-Profit Organizations. We did not process any contract audits conducted by the Defense Contract Audit Agency (DCAA) during the current reporting period.

## Significant Reports Unresolved Over Six Months

Timely resolution of outstanding audit recommendations continues to be a priority. As of this report date, we are responsible for monitoring 142 reports that contain recommendations that have been unresolved for more than six months. Of the 142 reports, we issued 72. Other audit organizations, such as legacy agency OIG's, FEMA OIG, and DCAA issued the remaining 70.

Management decisions have not been made for the following significant reports. Further explanations follow each report.

- Twenty-nine OMB Circular A-133 single audit reports

     Management is currently reviewing the reports and advises that it anticipates resolving the recommendations by September 30, 2005.

- Forty-five grant audit reports, of which we issued 40, and FEMA OIG issued 5 audit reports

     Management is currently reviewing the reports and advises that it anticipates resolving the recommendations by September 30, 2005.

- Eight DCAA reports processed by the OIG

     Management is currently reviewing the reports and advises that it anticipates resolving the recommendations by September 30, 2005.

# LEGISLATIVE AND REGULATORY REVIEW

Section 4 (a) of the IG Act requires the IG to review existing and proposed legislation and regulations relating to DHS programs and operations and to make recommendations concerning their potential impact. Our comments and recommendations focus on the impact of the proposed legislation and regulations on economy and efficiency in administering DHS programs and operations or on the prevention and detection of fraud and abuse in DHS programs and operations. We also participate on the President's

Council on Integrity and Efficiency, which provides a mechanism to comment on existing and proposed legislation and regulations that have a government-wide impact.

We also review and comment on DHS management directives involving DHS programs and operations. During this reporting period, we reviewed various draft DHS legislation, regulations, and policy directives. Some of these items are highlighted below:

**DHS Acquisition Regulation (HSAR)**: We commented on a draft final rule establishing a uniform Department-wide acquisition regulation to supplement the Federal Acquisition Regulation (FAR). The FAR and HSAR apply to all DHS entities, except the TSA. We suggested several possible clarifications. For example, in order to prevent potential contractor claims on existing contracts, the regulation should be clarified regarding contract modifications made to reflect HSAR changes. We also noted that the HSAR should require that costs associated with the time and effort to prepare an unsolicited proposal should be processed in accordance with FAR 31.205-18, "Independent Research and Development and Bid and Proposal Costs," unless the contract includes a specific provision setting forth the bid amount and proposal costs allocable to the contract.

**Application of Protective Action Guide for Radiological Dispersal Device and Improvised Nuclear Device Incidents**. We emphasized the importance of several coordination issues when commenting on this FEMA draft interim guidance. In particular, we noted the importance of aligning FEMA's guidance with the National Response Plan. We also commented that the U.S. Department of Justice should have been significantly involved in developing the guidance since it is a cooperating agency under the Nuclear/Radiological Incident Annex of the National Response Plan.

**DHS Draft Proposals for Intelligence Authorization Act for FY 2006**: We recommended more specificity with respect to the counterintelligence activities described. For example, we suggested itemizing the type of activities entailed as routine or targeted monitoring of computer traffic, telephone call destination/origination points, physical security checks, periodic polygraphs, and other standard security measures.

**Program Fraud Civil Remedies Act**: We provided comments on proposed regulations implementing the civil remedies within the Department. For all the program fraud cases we developed, we recommended designating the IG as the Investigating Official and our Counsel as the Representative of the Authority. Also, for all program fraud cases, we recommended designating the Under Secretary for Management as the Authority Head and the DHS General Counsel as the Reviewing Official.

**DHS Management Directive 11048, Denial and Revocation of Access to Classified Information**: This directive establishes DHS policy and procedures for carrying out the suspension, denial, and revocation of access to classified information. We emphasized the

Semiannual Report to the Congress

October 1, 2004 – March 31, 2005

importance of addressing temporary suspension of an individual's security clearance when information is developed suggesting that his or her continued access to classified information is not in the interest of national security.

## CONGRESSIONAL BRIEFINGS AND TESTIMONY

Meetings and briefings with members of Congress and their staff, and opportunities to testify, were less frequent during this reporting period due, in part, to intense bicameral Congressional activity focused on the passage of sweeping legislative reform of the intelligence community; and due, in part, to Congressional and staff focus on the 2004 general election - the first presidential election since the September 11, 2001, terrorist attacks.

On January 26, 2005, the Acting IG testified before Chairman Susan Collins and the Senate Committee on Homeland Security and Governmental Affairs at a hearing entitled, "The Department of Homeland Security: The Road Ahead." Also testifying were representatives from the Heritage Foundation, The RAND Corporation, the Council on Foreign Relations, and The Brookings Institution. The purpose of the testimony was to help the Committee identify the key challenges facing the Department over the next several years. Witnesses discussed the findings of recent reports on the achievements and remaining challenges in accomplishing DHS' mission. The Acting IG's testimony included examples from our past work and challenges highlighted in the recent report entitled, "Major Management Challenges Facing the Department of Homeland Security." The Acting IG's formal statement for the record, and work cited in the testimony can be read on our website at: www.dhs.gov.

In a follow up letter from Senator Joseph Lieberman, the Ranking Member, reported that many of the issues raised in the Acting IG's testimony were later discussed with Secretary Chertoff during his confirmation proceedings.

# APPENDICES

| Appendix 1 | Audit Reports with Questioned Costs |
| Appendix 1b | Audit Reports with Funds Put to Better Use |
| Appendix 2 | Compliance – Resolution of Reports and Recommendations |
| Appendix 3 | Management Reports Issued |
| Appendix 4 | Financial Assistance Audit Reports Issued |
| Appendix 5 | Schedule of Amounts Due and Recovered |
| Appendix 6 | Acronyms |
| Appendix 7 | OIG Headquarters and Field Office Contacts and Locations |
| Appendix 8 | Index to Reporting Requirements |

Semiannual Report to the Congress

October 1, 2004 – March 31, 2005

# Appendix 1
## Audit Reports With Questioned Costs

| Report Category | Number | Questioned Costs | Unsupported Costs |
|---|---|---|---|
| A. Reports pending management decision at the start of the reporting period[1] | 116 | $172,483,834 | $48,122,288 |
| B. Reports issued/processed during the reporting period with questioned costs | 33 | $27,641,002 | $18,536,119 |
| Total Reports (A+B) | 149 | $200,124,836 | $66,658,407 |
| C. Reports for which a management decision was made during the reporting period | 26 | $29,593,839 | $3,412,457 |
| (1) Disallowed costs | 22 | $28,302,284 | $2,514,604 |
| (2) Accepted costs | 8 | $1,291,555 | $897,853 |
| D. Reports put into appeal status during period | 0 | $0 | $0 |
| E. Reports pending a management decision at the end of the reporting period | 123 | $170,530,997 | $63,245,950 |
| F. Reports for which no management decision was made within six months of issuance | 81 | $124,946,379 | $42,850,104 |

**Notes and Explanations:**

[1]This number includes audit reports that were not reported in the previous reporting period.

"Management Decision" occurs when DHS management informs us of its intended action in response to a recommendation and we determine that the proposed action is acceptable.

"Accepted Costs" are previously questioned costs in a management decision as an allowable cost to a government program. Before acceptance, we must agree with the basis for the management decision.

**Page 33**

In Category C, lines (1) and (2) do not always equal the total on line C since resolution may result in values greater than the original recommendations.

In Category C, five (5) audit reports contained both allowed and disallowed costs.

Questioned costs – Auditors commonly question costs arising from an alleged violation of a provision of a law, regulation, grant, cooperative agreement or contract. A "questioned" cost is a finding in which, at the time of the audit, a cost is not supported by adequate documentation or is unreasonable or unallowable. A funding agency is responsible for making management decisions on questioned costs, including an evaluation of the findings and recommendations in an audit report. A management decision against the auditee would transform a questioned cost into a disallowed cost.

"Unsupported costs" are costs that are not supported by adequate documentation.

Semiannual Report to the Congress

October 1, 2004 – March 31, 2005

## Appendix 1b
## Audit Reports With Funds Put to Better Use

| Report Category | Number | Amount |
|---|---|---|
| A. Reports pending management decision at the start of the reporting period [1] | 12 | $60,751,649 |
| B. Reports issued during this reporting period | 0 | $0 |
| Total Reports (A + B) | 12 | $60,751,649 |
| C. Reports for which a management decision was made during the reporting period | 2 | $410,713 |
| (1) Value of recommendations agreed to by management | 2 | $410,713 |
| (2) Value of recommendations not agreed to by management | 0 | $0 |
| D. Reports put into the appeal status during the reporting period | 0 | $0 |
| E. Reports pending a management decision at the end of the reporting period | 10 | $60,340,936 |
| F. Reports for which no management decision was made within six months of issuance | 10 | $60,340,936 |

**Notes and Explanations:**

[1] This number includes audit reports and "funds put to better use," that were not reported in the previous reporting period.

In category C, lines (1) and (2) do not always equal the total on line C since resolution may result in values greater than the original recommendations.

"Funds Put to Better Use" – Audits can identify ways to improve the efficiency, effectiveness, and economy of programs, resulting in costs savings over the life of the program. Unlike questioned costs, the auditor recommends methods for making the most efficient use of federal dollars, such as reducing outlays, de-obligating funds, or avoiding unnecessary expenditures.

Page 35

*Office of Inspector General*

*Department of Homeland Security*

## Appendix 2
## Compliance – Resolution of Reports and Recommendations

### MANAGEMENT DECISION IS PENDING

|  | 9/30/2004 |
| --- | --- |
| Reports open over six months | 96 |
| Recommendations open over six months | 411 |
|  | 3/31/05 |
| Reports open over six months | 142 |
| Recommendations open over six months | 616 |

### CURRENT INVENTORY

| Open reports at the beginning of the period | 314 |
| --- | --- |
| Reports issued this period | 73 |
| Reports closed this period | 62 |
| Open reports at the end of the period | 325 |

### ACTIVE RECOMMENDATIONS

| Open reports at the beginning of the period | 1,654 |
| --- | --- |
| Reports issued this period | 332 |
| Reports closed this period | 338 |
| Open reports at the end of the period | 1,648 |

**Notes and Explanations:**

"Open reports" are those containing one or more recommendations for which a management decision or final action is pending.

"Active recommendations" are recommendations awaiting a management decision or final action.

Semiannual Report to the Congress

October 1, 2004 – March 31, 2005

## Appendix 3
## Management Reports Issued

| | Program Office/Report Subject | Report Number | Date Issued |
|---|---|---|---|
| 1. | Review of Alleged Actions by Transportation Security Administration to Discipline Federal Air Marshals for Talking to the Press, Congress, or the Public | OIG-05-01 | 11/04 |
| 2. | National Flood Insurance Program Management Letter for DHS's Fiscal Year 2003 Financial Statement Audit | OIG-05-02 | 11/04 |
| 3. | DHS Needs to Strengthen Controls For Remote Access to Its Systems and Data | OIG-05-03 | 11/04 |
| 4. | Summary of Evaluation of DHS' Security Program for Its Intelligence Systems[1] | OIG-05-04 | 01/05 |
| 5. | Independent Auditors' Report on DHS' FY 2004 Financial Statements | OIG-05-05 | 12/04 |
| 6. | Major Management Challenges Facing the Department of Homeland Security | OIG-05-06 | 12/04 |
| 7. | A Review of the Use of Stolen Passports from Visa Waiver Countries to Enter the United States | OIG-05-07 | 12/04 |
| 8. | Review of Compliance with the Currituck Beach Lighthouse Operating License | OIG-05-08 | 12/04 |
| 9. | DHS Requires Additional Processes and Controls Over Its National Security Systems[1] | OIG-05-09 | 01/05 |
| 10. | Review of the Port Security Grant Program | OIG-05-10 | 01/05 |

## Appendix 3
## Management Reports Issued

| | Program Office/Report Subject | Report Number | Date Issued |
|---|---|---|---|
| 11. | Implementation of the United States Visitor and Immigrant Status Indicator Technology Program at Land Border Ports of Entry | OIG-05-11 | 02/05 |
| 12. | Review of the Transportation Security Administration's Role in the Use and Dissemination of Airline Passenger Data | OIG-05-12 | 03/05 |
| 13. | Independent Review of the U.S. Coast Guard (USCG) Reporting of FY2004 Drug Control Funds Report | OIG-05-13 | 03/05 |
| 14. | Independent Review of the U.S. Customs and Border Protection's (CBP) Reporting of FY2004 Drug Control Funds | OIG-05-14 | 03/05 |
| 15. | Independent Review of U.S. Immigration and Customs Enforcement (ICE) Reporting of FY2004 Drug Control Funds | OIG-05-15 | 03/05 |
| 16. | Follow-Up Audit of Passenger and Baggage Screening Procedures at Domestic Airports[1] | OIG-05-16 | 03/05 |
| 17. | A Review of Procedures to Prevent Passenger Baggage Thefts | OIG-05-17 | 03/05 |
| 18. | Irregularities in the Development of the Transportation Security Operations Center | OIG-05-18 | 03/05 |

[1] These reports are classified.

Semiannual Report to the Congress

October 1, 2004 – March 31, 2005

## Appendix 4
## Financial Assistance Audit Reports Issued

| | Report Number | Date Issued | Auditee | Questioned Costs | Unsupported Costs | Funds Put to Better Use |
|---|---|---|---|---|---|---|
| 1. | DA-01-05 | 10/04 | North Carolina Department of Transportation | $154,982 | $0 | $0 |
| 2. | DA-02-05 | 10/04 | Hudson County, New Jersey | $2,082,429 | $859,199 | $0 |
| 3. | DA-03-05 | 10/04 | Audit of Crisis Counseling Program Funds Awarded to Virginia Department of Mental Health Retardation and Substance Abuse Services | $0 | $0 | $0 |
| 4. | DA-04-05 | 10/04 | Edgecombe County, North Carolina | $15,611 | $0 | $0 |
| 5. | DA-05-05 | 10/04 | Long Island Power Authority | $0 | $0 | $0 |
| 6. | DA-06-05 | 11/04 | Crisp County, Georgia | $190,375 | $0 | $0 |
| 7. | DA-07-05 | 12/04 | Jackson Energy Cooperative Corporation | $85,649 | $0 | $0 |
| 8. | DA-08-05 | 12/04 | New Hanover County, North Carolina | $536,923 | $0 | $0 |
| 9. | DA-09-05 | 01/05 | Municipality of Maunabo | $370,741 | $105,220 | $0 |
| 10. | DA-10-05 | 02/05 | Audit of State of Rhode Island Administration of Disaster Assistance Funds | $21,769 | $21,769 | $0 |
| 11. | DA-11-05 | 02/05 | Southeastern Pennsylvania Transportation Authority | $0 | $0 | $0 |

Office of Inspector General

Department of Homeland Security

## Appendix 4
## Financial Assistance Audit Reports Issued

| | Report Number | Date Issued | Auditee | Questioned Costs | Unsupported Costs | Funds Put to Better Use |
|---|---|---|---|---|---|---|
| 12. | DA-12-05 | 3/05 | Municipality of Mayagüez | $306,786 | $157,955 | $0 |
| 13. | DA-13-05 | 3/05 | Pitt County, North Carolina | $296,318 | $3,701 | $0 |
| 14. | DA-14-05 | 3/05 | Audit of the State of New Jersey Administration of Disaster Assistance Funds | $0 | $0 | $0 |
| 15. | DD-01-05 | 10/04 | Grant Management: Wisconsin's Compliance with Disaster Assistance Program's Requirements | $84,933 | $0 | $0 |
| 16. | DD-02-05 | 11/04 | Grants Management: Louisiana's Compliance With Disaster Assistance Program's Requirements | $652,052 | $34,265 | $0 |
| 17. | DD-03-05 | 02/05 | Grants Management: Louisiana's Compliance With Disaster Assistance Program's Requirements | $482,705 | $52,510 | $0 |
| 18. | DD-04-05 | 03/05 | State of Nebraska Emergency Management Agency's Implementation of Prior Audit Recommendations | $0 | $0 | $0 |
| 19. | DS-01-05 | 11/04 | City of Los Angeles - General Application, Los Angeles, California | $465,519 | $57,219 | $0 |
| 20. | DS-02-05 | 11/04 | Audit of the County of Monterey, Salinas, California | $98,112 | $0 | $0 |
| 21. | DS-03-05 | 12/04 | Audit of Humboldt County, Eureka California | $18,296 | $0 | $0 |

Semiannual Report to the Congress

October 1, 2004 – March 31, 2005

## Appendix 4
## Financial Assistance Audit Reports Issued

| | Report Number | Date Issued | Auditee | Questioned Costs | Unsupported Costs | Funds Put to Better Use |
|---|---|---|---|---|---|---|
| 22. | DS-04-05 | 12/04 | Audit of the City of Pacifica, Pacifica, California | $25,769 | $0 | $0 |
| 23. | DS-05-05 | 12/04 | Audit of Daly City, California | $53,658 | $0 | 0 |
| 24. | DS-06-05 | 12/04 | Audit of the County of Ventura, Ventura, California | $89,370 | $0 | $0 |
| 25. | DS-07-05 | 01/05 | Audit of Glenn County, Willows, California | $85,997 | $0 | $0 |
| 26. | DS-08-05 | 02/05 | Audit of the Santa Monica Hospital Medical Center, Woodland Hills, California | $1,426,109 | $0 | $0 |
| 27. | DS-09-05 | 02/05 | Audit of the Santa Clara Valley Water District, Santa Clara, California | $0 | $0 | $0 |
| 28. | DS-10-05 | 03/05 | Audit of Public Assistance Grant Funds Advanced to the City of Los Angeles, Department of General Services, Los Angeles, California | $512,381 | $0 | $0 |
| 29. | DS-11-05 | 03/05 | Audit of the City of Los Angeles, Department of Building and Safety, Los Angeles, California | $1,925,286 | $47,610 | $0 |
| 30. | DS-12-05 | 03/05 | Audit of the City and County of San Francisco, California | $170,069 | $142,068 | $0 |
| | | | Subtotal, Disaster Audits | $10,151,839 | $1,481,516 | $0 |

Page 41

Office of Inspector General

Department of Homeland Security

## Appendix 4
## Financial Assistance Audit Reports Issued

|  | Report Number | Date Issued | Auditee | Questioned Costs | Unsupported Costs | Funds Put to Better Use |
|---|---|---|---|---|---|---|
| 31. | OIG-S-01-05 | 02/05 | Miami Valley Fire, EMS Alliance, Montgomery County | $64,965 | $0 | $0 |
| 32. | OIG-S-02-05 | 02/05 | Catholic Healthcare West & Subordinate Corporations | $0 | $0 | $0 |
| 33. | OIG-S-03-05 | 02/05 | City of Argonia, Kansas | $0 | $0 | $0 |
| 34. | OIG-S-04-05 | 02/05 | Christus Health | $0 | $0 | $0 |
| 35. | OIG-S-05-05 | 02/05 | The Port Authority of New York and New Jersey | $11,556,143 | $11,556,143 | $0 |
| 36. | OIG-S-06-05 | 02/05 | City of Miami Springs, Florida | $0 | $0 | $0 |
| 37. | OIG-S-07-05 | 02/05 | City of Los Angeles, California | $0 | $0 | $0 |
| 38. | OIG-S-08-05 | 02/05 | Municipality of Hatillo, Puerto Rico | $0 | $0 | $0 |
| 39. | OIG-S-09-05 | 02/05 | Government of Guam | $197,787 | $153,987 | $0 |
| 40. | OIG-S-10-05 | 02/05 | Department of Defense, State of Hawaii | $0 | $0 | $0 |
| 41. | OIG-S-11-05 | 02/05 | Commonwealth of Puerto Rico— Governor's Authorized Representative | $590,712 | $350,397 | $0 |
| 42. | OIG-S-12-05 | 02/05 | American Samoa Government | $0 | $0 | $0 |
| 43. | OIG-S-13-05 | 02/05 | City of Hurst, Texas | $0 | $0 | $0 |
| 44. | OIG-S-14-05 | 02/05 | NYE County School District | $5,449 | $0 | $0 |

Semiannual Report to the Congress

October 1, 2004 – March 31, 2005

## Appendix 4
## Financial Assistance Audit Reports Issued

|  | Report Number | Date Issued | Auditee | Questioned Costs | Unsupported Costs | Funds Put to Better Use |
|---|---|---|---|---|---|---|
| 45. | OIG-S-15-05 | 02/05 | State of West Virginia | $0 | $0 | $0 |
| 46. | OIG-S-16-05 | 02/05 | Commonwealth of Puerto Rico, Puerto Rico Firefighters Corps | $0 | $0 | $0 |
| 47. | OIG-S-17-05 | 02/05 | Commonwealth of Puerto Rico, Puerto Rico Police | $57,314 | $0 | $0 |
| 48. | OIG-S-18-05 | 02/05 | State of North Carolina | $0 | $0 | $0 |
| 49. | OIG-S-19-05 | 02/05 | City of Calumet City, Illinois | $0 | $0 | $0 |
| 50. | OIG-S-20-05 | 02/05 | School District U-46, Elgin, Illinois | $0 | $0 | $0 |
| 51. | OIG-S-21-05 | 02/05 | State of New Jersey | $117,053 | $94,336 | $0 |
| 52. | OIG-S-22-05 | 02/05 | State of Missouri | $0 | $0 | $0 |
| 53. | OIG-S-23-05 | 02/05 | City of Kansas City, Missouri | $4,879,000 | $4,879,000 | $0 |
| 54. | OIG-S-24-05 | 02/05 | City of Kansas City, Missouri | $20,740 | $20,740 | $0 |
| 55. | OIG-S-25-05 | 02/05 | Commonwealth of Puerto Rico-- Governor's Authorized Representative | $0 | $0 | $0 |
|  |  |  | **Subtotal, Single Audits** | **$17,489,163** | **$17,054,603** | **$0** |
|  |  |  | **TOTAL** | **$27,641,002** | **$18,536,119** | **$0** |

Note: The narrative identifies 100% of the dollar amount we questioned. This appendix reflects the actual breakdown of what the grantee is expected to de-obligate or reimburse -- there is a percentage of what they pay vs. what we pay that we have to calculate.

Report Number Acronyms:
DA      Disaster, Atlanta
DD      Disaster, Dallas
DS      Disaster, San Francisco
OIG-S  Single Audits

Semiannual Report to the Congress

October 1, 2004 – March 31, 2005

## Appendix 5
## Schedule of Amounts Due and Recovered

| | Report Number | Date Issued | Auditee | Amount Due | Recovered Costs |
|---|---|---|---|---|---|
| 1. | DD-12-03 | 9/03 | State of Texas, Division of Emergency Management[1] | | $533,293 |
| 2. | DA-28-04 | 6/04 | Massachusetts Bay Transit Authority[2] | | $467,954 |
| 3. | H-S-13-03 | 2/03 | South Central Arkansas Electric Coop. | | $51,613 |
| 4. | DD-01-03 | 3/03 | Benson County, North Dakota[3] | | $82,920 |
| 5. | DA-24-04 | 5/04 | Virginia Dept. of Transportation | | $4,433 |
| 6. | DD-10-04 | 7/04 | Wyoming's Compliance with Disaster Assistance | | $9,449 |
| 7. | DD-16-04 | 8/04 | Grant Management: Ohio's Compliance w/ Disaster | | $8,995 |
| 8. | A-S-02-04 | 10/03 | State of Arkansas | | $148,436 |
| 9. | DD-11-04 | 7/04 | Grant Management: Texas' Compliance with Disaster[4] | $38,218 | $114,923 |
| 10. | DA-25-04 | 5/04 | Virginia Dept. of Transportation | | $55,592 |
| 11. | DA-15-03 | 7/04 | Municipality of Utuado, Puerto Rico | | $863,254 |
| 12. | DA-22-04 | 3/04 | Kentucky Transportation Cabinet | | $121,574 |
| 13. | DA-09-04 | 1/04 | Municipality of Naguabo, Puerto Rico | | $1,950,810 |

Page 45

*Office of Inspector General*

Department of Homeland Security

| | Appendix 5 | | | | |
| --- | --- | --- | --- | --- | --- |
| | **Schedule of Amounts Due and Recovered** | | | | |
| | **Report Number** | **Date Issued** | **Auditee** | **Amount Due** | **Recovered Costs** |
| 14. | DA-24-03 | 8/03 | Virgin Islands | | $695,593 |
| 15. | E-27-98 | 4/98 | Covington Electric Cooperative | | $58,884 |
| 16. | W-07-02 | 1/02 | California State University | $1,243,840 | $5,174,946 |
| 17. | OIG-S-11-05 | 3/05 | Commonwealth of Puerto Rico—Governor's Authorized Representative | | $86,480 |
| 18. | DD-13-04 | 8/04 | Cookson Hills Electric Cooperative, Inc. | | $209,231 |
| 19. | E-24-98 | 3/98 | Commonwealth of Puerto Rico, Administrative Costs Claimed Under the Individual Family Grant (IFG) Program | | $241,163 |
| | | | **TOTAL** | **$1,282,058** | **$10,879,543** |

Notes and Explanations:

[1] Actual recoveries exceeded amount questioned by $6,167 and were related to administrative recoupment for audit report DD-12-03.

[2] An adjustment was made on one audit recommendation for audit report, DA-28-04, which decreased the total questioned costs from $485,475 to $467,954.

[3] Recommendations were closed under audit report DD-01-03, even though $963 was not collected. OIG and audit management agreed to close the audit.

[4] Not all recoveries have been made on amounts due for audit report DD-11-04.

Semiannual Report to the Congress

October 1, 2004 – March 31, 2005

## Appendix 6
## Acronyms

| | |
|---|---|
| ADIT | Alien Identification Telecommunications System |
| BTS | Border and Transportation Security |
| CBP | Customs and Border Protection |
| CFR | Code of Federal Regulations |
| CGFAA | Cerro Grande Fire Assistance Act |
| CIO | Chief Information Officer |
| CIS | United States Citizenship and Immigration Services |
| DCAA | Defense Contract Audit Agency |
| DHS | Department of Homeland Security |
| DOJ | Department of Justice |
| DRO | Detention and Removal Operations |
| EP&R | Emergency Preparedness and Response |
| FAMS | Federal Air Marshal Service |
| FAR | Federal Acquisition Regulation |
| FBI | Federal Bureau of Investigation |
| FEMA | Federal Emergency Management Agency |
| FISMA | Federal Information Security Management Act |
| FPS | Federal Protective Service |
| FY | Fiscal Year |
| HMGP | Hazard Mitigation Grant Program |
| HSAR | Department of Homeland Security Acquisition Regulation |
| IAIP | Information Analysis and Infrastructure Protection |
| ICE | United States Immigration and Customs Enforcement |
| IG | Inspector General |
| INS | Immigration and Naturalization Services |
| ISP | Office of Inspections, Evaluations, and Special Reports |
| IT | Information Technology |
| KPMG | KPMG LLP |
| LHLS/EP | State of Louisiana Office of Homeland Security |
| OA | Office of Audits |
| OBC | Outer Banks Conservationists, Inc. |
| OI | Office of Investigations |
| OIG | Office of Inspector General |
| OMB | Office of Management and Budget |
| ONDCP | Office of National Drug Control Policy |
| OPR | Office of Professional Responsibility |
| OS | Office of Security |

## Appendix 6
## Acronyms

| | |
|---|---|
| POE | Port of Entry |
| TSA | Transportation Security Administration |
| UN | Unmet Needs |
| USC | United States Code |
| USCG | United States Coast Guard |
| USSS | United States Secret Service |
| US-VISIT | United States Visitor and Immigrant Status Indicator Technology |

Semiannual Report to the Congress

October 1, 2004 – March 31, 2005

## Appendix 7
## OIG Headquarters and Field Office Contacts

**Department of Homeland Security**
**Attn: Office of Inspector General**
**245 Murray Drive, Bldg 410**
**Washington, D.C. 20528**

| | |
|---|---|
| **Telephone Number** | **(202) 254-4100** |
| **Fax Number** | **(202) 254-4285** |
| **Website Address** | *www.dhs.gov* |

**OIG Headquarters Senior Management Team**

| | | |
|---|---|---|
| Richard L. Skinner | ................. | **Acting Inspector General** |
| Richard L. Skinner | ................. | **Deputy Inspector General** |
| Richard N. Reback | ................. | **Counsel to the Inspector General** |
| Richard Berman | ................. | **Assistant Inspector General/Audits** |
| Elizabeth Redman | ................. | **Assistant Inspector General/Investigations** |
| Robert Ashbaugh | ................. | **Assistant Inspector General/Inspections** |
| Frank Deffer | ................. | **Assistant Inspector General/IT** |
| Edward F. Cincinnati | ................. | **Assistant Inspector General/Administration** |
| Tamara Faulkner | ................. | **Congressional Liaison and Media Affairs** |
| Denise S. Johnson | ................. | **Executive Assistant to the Acting Inspector General** |

## Locations of Audit Field Offices

**Atlanta, GA**
3003 Chamblee-Tucker Rd., Suite 374
Atlanta, GA 30341
(770) 220-5228 / Fax: (770) 220-5259

**Boston, MA**
Captain J.F. Williams Federal Building
408 Atlantic Ave., Room 330
Boston, MA 02110
(617) 223-8600 / Fax: (617) 223-8651

**Chicago, IL**
55 W. Monroe St., Suite 1010
Chicago, IL 60603
(312) 886-6300 / Fax: (312) 886-6308

**Dallas, TX**
3900 Karina St., Suite 224
Denton, TX 76208
(940) 891-8900 / Fax: (940) 891-8948

**Houston, TX**
5850 San Felipe Rd., Suite 300
Houston, TX 77057
(713) 706-4611 / Fax: (713) 706-4625

**Indianapolis, IN**
5915 Lakeside Blvd.
Indianapolis, IN 46278
(317) 298-1596 / Fax: (317) 298-1597

**Kansas City, MO**
901 Locust, Room 470
Kansas City, MO 64106
(816) 329-3880 / Fax: (816) 329-3888

**Los Angeles, CA**
222 N. Sepulveda Blvd., Suite 1680
El Segundo, CA 90245
(310) 665-7300 / Fax: (310) 665-7302

**Miami, FL**
3401 SW 160th Ave., Suite 401
Miramar, FL 33027
(954) 602-1980 / Fax: (954) 602-1033

**Philadelphia, PA**
Greentree Executive Campus
5002 D Lincoln Drive West
Marlton, NJ 08053-1521
(856) 596-3831 / Fax: (856) 810-3412

**San Francisco, CA**
1111 Broadway, Suite 1200
Oakland, CA 94607-4052
(510) 627-7007 / Fax: (510) 627-7017

**St. Thomas, VI**
Nisky Center, Suite 210
St. Thomas, VI 00802
(340) 774-0190 / Fax: (340) 774-0191

**San Juan, PR**
654 Plaza
654 Munoz Rivera Ave., Suite 1700
San Juan, PR 00918
(787) 294-2500 / Fax (787) 771-3620

Semiannual Report to the Congress

October 1, 2004 – March 31, 2005

## Locations of Investigative Field Offices

**Atlanta, GA**
3003 Chamblee - Tucker Rd., Suite 301
Atlanta, GA 30341
(770) 220-5290 / Fax: (770) 220-5288

**Boston, MA**
Captain J.F. Williams Federal Building
408 Atlantic Ave., Room 330
Boston, MA 02110
(617) 223-8320 / Fax: (856) 810-3410

**Buffalo, NY**
138 Delaware Ave., Room 524
Buffalo, NY 14202
(716) 843-5700 x520 / Fax: (716) 551-5563

**Chicago, IL**
55 W. Monroe St., Suite 1010
Chicago, IL 60603
(312) 886-2800 / Fax: (312) 886-2804

**Dallas, TX**
3900 Karina St., Suite 228
Denton, TX 76208
(940) 891-8930 / Fax: (940) 891-8959

**Del Rio, TX**
Amistad National Recreation Area
4121 Highway 90 West
Del Rio, TX 78840
(830) 775-7492 x239

**Detroit, MI**
Levin Federal Courthouse
231 W. Lafayette, Suite 1044
Detroit, MI 48226
(313) 226-2163 / Fax: (313) 226-6405

**El Centro, CA**
321 South Waterman Ave., Room 108
El Centro, CA 92243
(760) 335-3549 / Fax: (760) 335-3534

**El Paso, TX**
1200 Golden Key Circle, Suite 230
El Paso, TX 79925
(915) 629-1800 / Fax: (915) 594-1330

**Houston, TX**
5850 San Felipe Rd., Suite 300
Houston, TX 77057
(713) 706-4600 / Fax: (713) 706-4622

**Laredo, TX**
901 Victoria St., Suite G
Laredo, TX 78041
(956) 794-2917

**Los Angeles, CA**
222 N. Sepulveda Blvd., Suite 1640
El Segundo, CA 90245
(310) 665-7320 / Fax: (310) 665-7309

**McAllen, TX**
Bentsen Tower
1701 W. Business Highway 83, Room 510
McAllen, TX 78501
(956) 618-8145 / Fax: (956) 618-8151

## Locations of Investigative Field Offices

**Miami, FL**
3401 SW 160th Ave., Suite 401
Miramar, FL 33027
(954) 602-1980 / Fax: (954) 602-1033

**New York City, NY**
c/o Dolan Financial
525 Washington Blvd., Suite 1602
Jersey City, NJ 07310
(201) 798-8165 / Fax (201) 798-8239

**Philadelphia, PA**
Greentree Executive Campus
5002 B Lincoln Drive West
Marlton, NJ 08053
(856) 596-3800 / Fax: (856) 810-3410

**San Diego, CA**
701 B St., Room 560
San Diego, CA 92101
(619) 557-5970 / Fax: (619) 557-6518

**San Francisco, CA**
1301 Clay St., Suite 420N
Oakland, CA 94612-5217
(510) 637-4311 / Fax: (510) 637-4327

**Seattle, WA**
1110 3rd Ave., Suite 116
Seattle, WA 98101
(206) 262-2110 / Fax: (206) 262-2495

**St. Thomas, VI**
Office 550 Veterans Dr., Room 207A
St. Thomas, VI 00802
(340) 777-1792 / Fax: (340) 777-1803

**San Juan, PR**
654 Plaza
654 Munoz Rivera Ave., Suite 1700
San Juan, PR 00918
(787) 294-2500 / Fax: (787) 771-3620

**Tucson, AZ**
Federal Office Building
10 East Broadway, Suite 105
Tucson, AZ 85701
(520) 670-5243 / Fax: (520) 670-5246

**Washington, DC**
**(Washington Field Office)**
245 Murray Drive, SW
Building 410
Washington, DC 20528
(202) 254-4096 / Fax: (202) 254-4292

Yuma, AZ agents are temporarily operating out of the El Centro, CA field office.

Semiannual Report to the Congress

October 1, 2004 – March 31, 2005

## Appendix 8
## Index to Reporting Requirements

The specific reporting requirements prescribed in the Inspector General Act of 1978, as amended, are listed below with a reference to the pages on which they are addressed.

| Requirements: | Pages |
|---|---|
| Review of Legislation and Regulations | 29 |
| Significant Problems, Abuses, and Deficiencies | 6-28 |
| Recommendations with Significant Problems | 6-28 |
| Prior Recommendations Not Yet Implemented | 29 |
| Matters Referred to Prosecutive Authorities | 1 |
| Summary of Instances Where Information Was Refused | N/A |
| Listing of Audit Reports | 37-44 |
| Summary of Significant Audits | 6-28 |
| Reports with Questioned Costs | 33-34, 39-44 |
| Reports Recommending That Funds Be Put To Better Use | 35 |
| Summary of Reports in Which No Management Decision Was Made | 29, 33-35 |
| Revised Management Decisions | N/A |
| Management Decision Disagreements | N/A |

Page 53

## Additional Information and Copies

To obtain additional copies of this report, call the Office of Inspector
General (OIG) at (202) 254-4100, fax your request to (202) 254-4285, or
visit the OIG web site at www.dhs.gov/oig.

## OIG Hotline

To report alleged fraud, waste, abuse or mismanagement, or any other kind
of criminal or noncriminal misconduct relative to Department programs or
operations, write to DHS Office of Inspector General/MAIL STOP 2600,
Attention: Office of Investigations - Hotline, 245 Murray Drive, SW,
Building 410, Washington, DC 20528; fax the complaint to (202) 254-4292
or email DHSOIGHOTLINE@dhs.gov. The OIG seeks to protect the
identity of each writer.